The opinion of the court was delivered by
Monroe, J.
Upon October 2nd, 1895, Margareth McTiernan died in. New Orleans, and upon July 5, 1897, Patrick Burns, her husband, followed her to the grave. The decedents left, surviving them, four major children, issue of their marriage, to-wit: Thomas, Annie, Ilenry P., and Francis E. Burns. The successions were consolidated, and Annie Burns qualified as executrix of both parents, and, in June, 1898, filed an account which was opposed by a number of persons, among whom were Henry P., and Thomas Burns, her brothers.
It appears that Thomas Burns was the eldest child, and that he was born in 1855, and married in 1874, before attaining the age of nineteen years. Upon the thirtieth of November, 1891, his parents, Margareth Burns and her husband, made wills, by public acts, substantially identical in terms, and, muiatis mutantis, reading as follows, to-wit:
“ My name is Margareth McTiernan; 1 am the wife of Patrick Burns; I have never been married except to Patrick Burns, by whom I have five children living, all of full age of majority, namely Thomas, Annie, Henry P., Lawrence W., and Frank E. Burns. I desire to, and do, by these presents, disinherit my son, Thomas Burns, because he got married while a 'minor, without my consent or knowledge, and without the consent or knowledge of my husband. I hereby will and bequeath to my daughter, Annie Burns, all that part and portion of my estate, which the laws of this 'State allow me to dispose of, giving it to her as an extra portion and advantage. The balance of my estate, I desire shall be equally divided between my four children, Annie, Henry, Lawrence W., and Frank E. Burns. I nominate, and appoint my husband, Patrick Burns, to be the testamentary executor of this, my last will and testament, with full seizin and detainer of my estate, and specially exempt him from giving the security required by law in such cases; and, in case of his inability to act, I appoint my daughter, Annie Bums, testamentary executrix of this will, with seizin, and without bond, and, in case of the inability of both to act, I nominate and appoint my son, Lawrence W. Burns, to be the testamentary executor of this will, with seizin of my estate, and without, bond. I never made a will before.”
*1379 Patrick Burns names his son Henry P. Burns as his executor, in the last resort, where Mrs. Burns names Lawrence W. Burns; the dispositions in the two wills are, otherwise, identical. Lawrence W. Burns having died without issue, in 1894, before the death of either parent, the executrix proposes to divide the estate between Henry P. and Frank E. Burns, and herself, to the exclusion of Thomas, who is considered as disinherited. She, however, calls upon Henry P. Burns to collate the sum of one thousand nine hundred and eighty-two 89-100 dollars, which she claims that he has already received, and the judgment of the lower court holding that the attempted disinherison of Thomas iij not effective, and that Henry is not bound to collate, she has appealed therefrom, and asks that it be reversed in those particulars.
By the textual provisions of the Code, the marriage of a minor, without the consent of the father and mother is a “just”, or “good” cause for disinherison (C. C., 112, 1621) ; but, in order to make such disinherison effective, the reason therefor must be expressed in the testament, “And the other heirs of the testator are moreover obliged to prove the facts on ivhich the disinherison is founded, otherwise it will be null.” C. C., 1624.
It is undisputed that Thomas Burns married whilst yet a minor; the other fact to be established is that he married without the consent of his parents, and this fact, we think, is established by the, testimony of his brother and sister, and of Scully, who was his intimate friend at the time of his marriage, sustained, as it is,.by strong corroborating circumstances. Henry P. Burns was born in 1864, and was, therefore, about ten years of ag>e in 1874, when his brother married. He testifies that his parents did not give their consent, and his sister, Annie, who was born in 1862, and was, therefore, about twelve years of age at the date of the marriage, testifies to the same effect. Scully testifies that, at the time of the marriage, Thomas Burns was excluded from his father’s house, and was living with the family of the young lady who became his wife, that he asked him, Scully, “to stand up with him”, and that the witness refused, unless he would let his father know all the facts; that a Mr. Duran, who was in the employ of Patrick Burns, was sent to see if he could get his consent to the marriage, and that he brought “an answer” back, and that the marriage took place at once, though they had not intended that it should be celebrated until two days later. The witness does not state what the answer brought by *1380 Duran was, nor does he say that he “stood up” with Thomas Burns. He does say, however, that, after the marriage, Burns lived with his wife’s family; and that it was something like two years before he visited his father’s house; and, in this, he is fully corroborated by Thomas Burns, himself, who also testifies that it was “four, five, or six years” after his marriage, before his wife visited his father’s house, and that, whilst his mother attended the funerals of his three children, his father did not.
It is true that Patrick and MargaretH Burns took their son into their house, at different times, when he needed assistance, but his wife was not with him, and they never became reconciled to her, or to the marriage.
They certainly were not reconciled when, seventeen years after it had taken place, they- disinherited their eldest son, on account of it, and the proof is equally wanting to show that they became reconciled thereafter. On the contrary, the mother lived about four years, and the father nearly six years, after the making of their wills, and yet they died leaving them unchanged. It may be remarked too, that, whilst Thomas Burns took the stand, as a witness in his own behalf, he did not undertake to deny that he had married without the consent of his parents; or to assert that they had ever become reconciled to it. Under these circumstances, we have no alternative but to apply plain provisions of law to equally plain facts, and, doing so, to maintain the provisions of the wills of Patrick and Mafgareth Burns which are the subjects of the present attack.
Bosworth vs. Beiler, 2 A., 293.
The executrix states in her account, that Henry P. Burns should collate the sum of one thousand nine hundred and eighty-two 89-100 dollars, made up, as she claims, of one thousand five hundred dollars received by him as the proceeds of a mortgage given by Patrick Burns to James Timony, and of four hundred and eighty-two 89-100 dollars being, as she alleges, the amount of rent collected by him for the account of Michael McTiernan. of whom Patrick Burns was the agent, and for which rent the succession is held responsible. It is admitted that, of the one thousand five hundred dollars represented by the Timony mortgage, three hundred dollars was used for the purpose of paying a pre-existing debt, due to the mortgagee, and that one hundred and five dollars was deducted by way of discount, so that the actual amount *1381 derived from the mortgage in. question, which went into the hands ox Henry Burns, was one thousand and ninety-five dollars. As we understand his testimony, the receipt of this money is not denied by him, but he claims that it was paid to him, by his father,,for services rendered, as workman, or foreman, during a number of years, preceding his father’s death, and hence, is not subject to collation. This theory finds little or no support outside of the testimony of the opponent, Henry P. Burns, himself, and that testimony, so far from being satisfactory, is largely unintelligible.
The witness seems to date the beginning of his services as far back as 1879, when he was fifteen years of age, and speaks of having worked between 1879 and 1891 or 1892. He admits that, during all that period, he lived at his father’s house, free of charge, was clothed by his father, and received a small amount each week for incidental expenses. He says that his wages as foreman were three 50-100 dollars per day, but he does not tell us from what date they were fixed at that rate, and he presents no statement of debits and credits, and seeks to leave the impression that not a dollar was ever paid to him until the proceeds of the mortgage in question wex’e turned over to him, in globo, without any adjustment of his account and under circumstances which render the explanation, which he now attempts to make, an unusually difficult one. The transaction took place in May, 1896, some seven or eight months after the death of Mrs. Burns, and consisted, in part, of the imposition of a mortgage, by the surviving husband, upon the property of the pre-existing community; — a mortgage of fifteen hundred-dollars, which, considering that the entire interest of Patrick Burns in that community was appraised, two years later, at three thousand and seventy 50-100 dollars, it must be admitted, was, relatively, a heavy burden. Beyond this, the evidence shows that Patrick Burns was then in a very poor state of health; that he continued to get worse until he died, in July, 1897; and that he, himself, was so sadly in need of money, that, about that time, he was obliged to get his son, Dr. Frank Burns, to send one hundred dollars to his brother-in-law, McTiernan, on account of a considerably larger sum, representing rents due to the latter which had been collected, and for which he was responsible, the one hundred dollars thus borrowed being in addition to four hundred dollars which he had borrowed from the same son several years before, and which were, in part, unpaid, at the date of his death. Further *1382 than, this, the evidence shows that the opponent, Henry Burns, used the money in question in the building of a house on certain lots which stood upon the public record as the property of Annie Burns, his sister, and that, whilst the building was going on, in 1896, his father being still alive, he went to California, where he was entertained for some weeks by his mother’s brother, Michael McTiernan, who testifies concerning a conversation with him, as follows: “He made a remark, unsolicited; he said, I am building a house for my sister Annie; and I said, where arc you building the house; lie made no reply; 1 said, where did you get the money to build, and he said, we arranged it on a mortgage!” The opponent now undertakes to say, by way of explanation, that the lots, standing in the name of his sister Annie, in reality belonged to him, and that he had put the title in her name, because he was in business as a builder, and,‘as we understand him, was liable.to have claims, of one kind or another, made against him, so that it was safer for him to have his property in the name of some one else. It also appears from his testimony, that there was some exchanging'of property between his sister Annie and himself, and it is stated in argument,'that she now owns the property referred to. These explanations are difficult to understand, but the undisputed fact remains that the opponent does not deny that the proceeds of the fifteen hundred dollar mortgage, given by his father, less three hundred dollars which was already due to the mortgagee, and less one hundred and five dollars discount, inured to his personal, individual benefit, and he claims that he is entitled to keep it, free of collation. Considering this claim, apart from any specific testimony concerning it, there is nothing in this récord which would justify the conclusion that Patrick Burns would have had his son to work for him for years, at the agreed price of three 50-100 dollars per day, and pay him absolutely nothing; and there is still less, if possible, to indicate that the opponent would have worked for Kis father, or for anyone else, on such terms. .'Beyond the testimony of one or two witnesses, who knew that he worked for, or with, his father, his testimony that the amount in question was paid to him, as back wages, is entirely without support, and is inconsistent with probability and with his own statement made to his uncle, during his father’s life.
We are therefore of the opinion that this amount should be collated.
As to the four hundred and eighty-two 89-100 dollars, of rent, which *1383 he is said to have collected, the evidence makes it probable, not that he collected the rents, but that he received a part, and probably a considerable part, of the amount, from his sister, by whom it was collected from the tenants. But this is not established with sufficient certainty to justify a judgment holding him liable.
It is, therefore, ordered, adjudged and decreed that the judgment appealed from be reversed, in so far as it sustains the opposition of Thomas M. Burns to the account filed by the executrix, and in so far as it sustains the opposition of Henry P. Burns, with respect to the sum of one thousand and ninety-five dollars, included in the item of one thousand nine hundred and eighty-two 89-100 dollars; and it is now ordered, adjudged, and decreed that the opposition of Thomas M. Burns, and the opposition of Henry P. Burns as to the sum of one thousand and ninety-five dollars, included in the. item of one thousand nine hundred and eighty-two 89-100 dollars for which he is called upon to collate, be rejected, and the claims of the opponents be dismissed. It is further ordered, that, in all other respects, the judgment appealed from be affirmed, and that this cause be remanded to be proceeded with according to law, and to the views expressed in this opinion, the costs, in the lower court, of the opposition of Thomas M. Burns, to be paid by said opponent, and the costs, in the lower court, of the opposition of Henry P. Burns, to be paid by the succession, and the costs of the appeal to be paid by the said two opponents in solido.